STATE OF MARYLAND, TO THE USE OF GEORGIA R. POOLE AND HAROLD SCARBORO, TRUSTEES, *vs.* HENRY MAURICE TALBOTT ET AL.

*Orphans' Court—Jurisdiction—Presumption on Appeal—Approval of Executor's Bond.*

While orphans' courts are courts of limited statutory jurisdiction, which may not be extended by construction or implication, acts within the limits of that jurisdiction will be assumed to be proper in the absence of any evidence to the contrary. p. 79

The orphans' court having jurisdiction to grant letters testamentary, it is empowered to pass upon and decide matters necessarily incident to the exercise of that power.          p. 79

Since under Code, art. 93, sec. 41, neither the orphans' court nor the register of wills has authority to commit letters testamentary to the executor until an executor's bond is filed in a penalty fixed by either one or the other of them with sureties approved by one or the other of them, it could be assumed, letters testamentary having been actually issued and a bond actually filed, and there being no showing to the contrary, that the court or the register of wills fixed the penalty of the bond and approved it, although the docket showed no entry of such approval or order fixing the penalty.                pp. 79, 80

That Code, art. 93, sec. 41, provides that, whenever an executor is excused by the testator from giving bond, "only such bond shall be given" as may be deemed sufficient to secure the payment of debts, taxes, etc., and the bond shall be conditioned accordingly, does not prevent the executor, if he sees fit, from giving a general bond, or affect the validity of such a bond.
p. 81

Property in the exclusive possession of an executor, which he has refused or on demand failed to surrender to testamentary trustees, of whom he is one, will not be presumed to have been transferred to such trustees, without any affirmative overt act by the executor, merely because of the lapse of the period allowed by law to the executor for settling the estate, or because of the filing of his final administration account.        pp. 81-84

*Decided April 9th, 1925.*

Appeal from the Circuit Court for Montgomery County (URNER, C. J., and WORTHINGTON, J.).

Action by the State of Maryland to the use of Georgia R. Poole and Harold Scarboro, trustees, against Henry Maurice Talbott, Joseph Reading, and Albert B. J. Almoney. From a judgment for the two last named defendants, plaintiffs appeal. Reversed.

The cause was argued before BOND, C. J., ADKINS, OFFUTT, DIGGES, PARKE, and WALSH, JJ.

*Edward J. Coolahan,* with whom was *Austin J. Lilly* on the brief, for the appellants.

*William F. Prettyman,* with whom were *Talbott & Prettyman* on the brief, for the appellees.

OFFUTT, J., delivered the opinion of the Court.

Evelina W. Poole died in 1904, leaving a last will which was probated in the Orphans' Court of Montgomery County, December 27th, 1904. In that will, after leaving pecuniary legacies to two of her children, she devised and bequeathed the residue of her estate to Georgia R. Poole and Henry Maurice Talbott, in trust to invest the proceeds and to pay over the income to the said Georgia for the maintenance and support of herself and her two children, Thomas S. and Mary R. Poole. She further provided that

"In the event of the marriage of the said Georgia R. Poole before the youngest of said children shall arrive at the age of twenty-one (21) years, then the income from such sum shall be applied to the support and maintenance of said children and the entire principal shall be equally divided between them at such times as shall be deemed proper by said Henry Maurice Talbott, provided said payment shall be made before each shall arrive at the age of 25 years. It is my desire that my grandson, Thomas S. Poole, shall receive such education as my said trustees may think advisable, and said trustees are hereby directed and authorized to use for this purpose so much as may be necessary of the money as may be coming to him for such purpose. In the event the said Georgia R. Poole does not marry before the youngest of said children shall have arrived at the age of 21 years, then I desire that said principal sum shall be equally divided between the said Georgia R. Poole and said children, each one receiving one-third part."

Finally, in the following clause, she appointed Henry Maurice Talbott her executor:

"I hereby instruct and appoint Henry Maurice Tal-
bott, executor of this my last will and testament, who
agrees to serve as such without compensation, and I
desire that no bond shall be required of him."

On April 11th, 1905, a bond in the penalty of $20,000,
executed by Talbott as executor and Joseph Reading and
A. J. Almoney as sureties, was filed, and on the same day
letters testamentary were issued to Mr. Talbott. The con-
dition of that bond was as follows:

"That if the above bounden Henry Maurice Tal-
bott shall well and truly perform the office of executor
of last will of Evelina W. Poole, late of Montgomery
County, deceased, according to law, and shall in all
respects discharge the duties of him required by law,
as executor aforesaid, without any injury or damage
to any person interested in the faithful performance
of the said office, then the above obligation shall be
void; it is otherwise to be in full force and virtue in
law."

After the grant of letters Mr. Talbott reduced the assets
of the estate to his possession and, on September 14th, 1906,
his first and final administration account was passed, show-
ing a balance in his hands of $8,544.24, and bearing this
notation:

"The above balance goes into the hands of trustees
under will of Evelina W. Poole, deceased."

That account shows that the executor claimed and was
allowed commissions amounting to $223.73, and it indi-
cated that the balance in his hands was in the form of mort-
gages.

That balance was never actually transferred to Mrs.
Poole and Mr. Talbott as trustees, and on February 1st,
1913, the *cestuis que trust* brought an action in the Circuit
Court for Montgomery County in equity against Mr. Tal-
bott individually and as executor of the will of Evelina W.
Poole for an administration of the trust estate and the ap-

pointment of trustees to receive from him individually and as executor of the last will and testament of Evelina W. Poole the proceeds of the estate not accounted for, and in that proceeding Georgia R. Poole and Harold E. Scarboro were appointed substituted trustees and, on March 23rd, 1915, it was decreed that

> "the defendant, Henry Maurice Talbott, executor and individually forthwith pay to said trustees the said sum of seven thousand, nine hundred three and 12/100 dollars ($7,903.12) without further deduction or abatement, except installments of said sum as shall be paid to said trustees and duly credited hereon."

Following that decree, from time to time efforts were made by the trustees to obtain the balance found by the decree to be due the estate from Mr. Talbott, and some part of it was secured, but the greater part remained unpaid, and on March 20th, 1916, the substituted trustees brought in the Circuit Court for Montgomery County an action on the executor's bond against Henry Maurice Talbott, Joseph Reading, and Albert J. Almoney to recover that balance. The defendants pleaded, (1) *non est factum;* (2) never indebted; (3) *plene administravit;* and (4) a traverse of the allegation that the executor had not well and truly performed the duties of his office. Issue was joined on those pleas and the case came on to be tried before the court sitting as a jury, and at the conclusion of the whole case the court granted the defendants' first prayer, which directed a verdict for the defendants, Reading and Almoney, on the ground that there was no evidence in the case legally sufficient to warrant a recovery against them. A verdict and judgment were accordingly entered for those defendants, and from that judgment the plaintiffs appealed.

The only exception found in the record relates to the action of the court in granting that prayer.

The appellees contend: (1) that since the executor was, by the terms of the will, excused from giving bond, that neither the orphans' court nor the register of wills had

authority to accept any bond except for the payment of debts, taxes, or assessments, and that this bond not being for that purpose was either void, or at most only liable for default in the payment of debts, taxes, or assessments; (2) that the bond was never approved by the orphans' court and was therefore void; (3) that when the executor stated his final account, and the period prescribed by law for completing the administration expired, possession of the estate by operation of law was transferred from Talbott as executor to Talbott and Mrs. Poole as trustees; and (4) that the plaintiffs are barred from recovery by the conduct of Mrs. Poole as trustee.

Before considering these propositions, we will refer briefly to the evidence relating to them, the truth of which will for the purpose of this opinion be assumed.

Much of the evidence in the record relates to the amount of Talbott's indebtedness to the estate, but since there was evidence to show that he was indebted to the estate for an amount within the jurisdiction of the court, and as the prayer denied the plaintiff the right to recover at all, we need not refer particularly to it. The other evidence may be considered under two heads, that relating to the factum of the bond, and that relating to the conduct of Mrs. Poole.

There is no record evidence that the Orphans' Court of Montgomery County ever fixed the penalty or approved the bond, or that any proceeding of any kind in connection with it was ever instituted. The records of the register of wills show the probate of the will, the filing of the bond, the oath, the grant of letters, and the filing and passing of the account and nothing else. In referring to that situation, Miss Lydia F. Prettyman, a clerk in the office of the register of wills, said: "I have not made any search, but when an executor is appointed in our court we do not have such an order. If an administrator, they have to have an application which shows that they must give a bond, but when an executor is appointed the court just requires him verbally to give his bond. Q. And there is no record? A. There is no record." Later,

Miss Prettyman was recalled and gave this testimony: "Suppose the register of wills receives a bond, and marks it, files it, and issues the letters testamentary, and subsequently, when the court is in session, obtains the verbal approval of the court. Would there be any entry made in accordance with the practice of your office of that approval? A. To my knowledge the letters have never been issued without the bond having been approved by the court. The letters have never been issued by the register of wills, only after the bond has been approved by the court. * * * Q. This bond in which we are concerned, in the present case, appears to have been marked filed by the register of wills, and the same day letters were issued to the executor, but there appears to be no entry of record of the approval of the bond of the orphans' court, in accordance with the practice, do you understand? Would the approval of the orphans' court be entered in the record in accordance with the practice in such a case as this? A. No, I think not, but I do not know of any case like that. Letters are never issued until the bond is formally approved by the court and an order signed approving it, which is recorded in our minutes. * * * Q. Is that the invariable practice, to pass a formal order of approval? A. It has been since I have been in the office. Q. And this is entered on the minutes? A. Yes, this is entered in the minutes. Q. And you know of no case where the court approved a bond verbally? A. No * * * Q. What is your usual practice in the orphans' court in regard to the bond and issuance of letters? Do you allow letters to be issued without bond being approved, without the formal approval of the bond? A. No, I think not. * * * You say there is no formal issuance of letters in the case of an executor? A. There is no record of it. We do not record that. We give a certificate to the executor that he has been appointed by the court, signed by the register. Q. There is no memorandum made on your docket as to the issuance of that? A. We do not record it. Only the date."

Mr. Talbott, testifying for the defendants, was unable to

recall any of the circumstances surrounding the execution
or the filing of the bond, and when asked about that he said:
"Q. I want to ask you, Mr. Talbott, as to the occasion for
giving a bond in this case, of $20,000; do you recall why
this was done? A. No, I do not. Q. You are familiar with
the will? A. I recall the provision of the will and I was
rather surprised at the size of the bond. I know the custom
of the court is always to require some kind of a bond, but I
have no independent recollection of why that bond should be
that amount, absolutely not."

Concerning the conduct of Mrs. Poole, the only testimony
found in the record is that of Mr. Talbott, Mrs. Poole her-
self, and Mr. Harold Scarboro. She testified that, begin-
ning before 1906 to 1915, she repeatedly asked Mr. Talbott
about the estate and demanded that he inform her of the
investments, and Mr. Talbott told her that the papers had
been mislaid and put her off on one pretext or another until
she finally employed a lawyer to assist her; that Mr. Talbott
never turned over the estate to her; that he never turned
over one penny or paper in the case to her except the amounts
with which he was credited, and that she did not acquiesce
in his withholding the estate from her. Although upon his
promises to pay she agreed from time to time to delay press-
ing her demands.

The testimony of Mr. Talbott throws little positive but
more reflected light on the issues, as may be seen from these
extracts from it: "Q. Do you recall whether or not she
expressed a desire to have these funds credited to your joint
account? A. No, so far as I know, she did not, although I
am not prepared to say she did not. I have no recollection
of it." Speaking of the securities, he gave this testimony:
"When the account was settled in orphans' court, they never
had been paid, had they? A. No, I do not believe so. Q.
They had a balance of $8,000 to be distributed to Mrs.
Poole and yourself as trustees? A. Yes. Q. Why were
they not transferred to yourself and Mrs. Poole as trustees?
A. I suppose carelessness on my part and carelessness on

hers, too. * * * You did not hold these securities as attorney for the estate? A. Oh, no. Q. You held them as executor? A. I held them as executor and the McMillan mortgage was given as executor. * * * She and we, she and I, were trustees under the will. I never turned anything over, and if I ever turned any paper over to her it was the John H. Poole mortgage or deed of trust. I am rather inclined to think I turned that over to her and another one that I turned over to her, the Mills trust of $500. That was collected through the office of Talbott and Prettyman. * * * Q. That you were presumed to turn over as an individual, and you should have, to yourself and your co-trustee, as co-trustees, this property? You know that you and Mrs. Poole were co-trustees and that you and Mrs. Poole as co-trustees were entitled to have that property made over to you as co-trustees, even though no demand were made? A. Oh, undoubtedly. And the Mills mortgage was turned over to her and the McMillan mortgage. * * * What has become of the other securities, Mr. Talbott? That question has not been asked. It is rather an important question, I think, and if it has not been asked, we would like to know about it. A. I cannot tell you. It has been too long ago to say what has become of them. Q. They were collected? A. I presume so. * * * Q. What became of the proceeds of those you did collect? A. That I cannot tell. Q. Have you no recollection? A. No, sir; no recollection. Q. The beneficiaries under the will did not get them? A. No. Q. You got the benefit of the proceeds, individually, as they were collected? A. I presume so, except the $1,200 I did not collect at all."

It also appeared that in 1907, 1908, and 1909 Talbott released mortgages, and that in 1910 he assigned a mortgage as executor of Evelina W. Poole.

Harold Scarboro testified that he, on behalf of Mrs. Poole, had from 1906 again and again tried to have Talbott turn over the estate to the trustees without avail.

Returning to the propositions upon which the position of the appellees depend, we cannot agree that the bond in this

case is void because it is not authorized by law, or because it was not approved by the orphans' court or the register of wills. Whether a bond which had not been so approved would be valid is not material and need not be considered, because in our opinion upon the evidence before us it must be presumed that the penalty of the bond was fixed and the bond approved by the orphans' court. Orphans' courts are courts of limited statutory jurisdiction, which may not be extended by construction or implication. *Bagby, Md. Law of Excrs., etc.,* p. 221. But its acts within the limits of that jurisdiction will be assumed to be proper in the absence of any evidence to the contrary. *Parker v. Leighton,* 131 Md. 407; *Grill v. O'Dell,* 111 Md. 69; *Pacy v. Cosgrave,* 113 Md. 321; *Stanley v. Safe Dep. Co.,* 88 Md. 407; *Bagby, Excrs., etc.,* 489, 133, 158. That the orphans' court had jurisdiction to grant letters testamentary on the will in this case cannot be questioned, and it therefore was empowered to pass upon and decide such matters as were necessarily incident to the exercise of that power.

By section 41, article 93, Bagby's Code P. G. L. of Md., it is provided: "Whenever any will or codicil shall have been authenticated or proved * * * letters testamentary may forthwith be committed to the executor or executors named in said will or codicil; provided, the said executor or each of the executors shall execute a bond to the State of Maryland, with two sureties approved by the register or court in such penalty as the said register or court may require, * * * and said bond shall be conditioned for the faithful performance of the trust reposed in him as executor, to be lodged and recorded in said register's office, and subject to be put in suit as hereinafter mentioned; but whenever an executor is excused by the testator from giving bond, then only such bond shall be given in an amount as the court or register shall consider sufficient to secure the payment of the debts, taxes, assessments due by the deceased; and the said bond shall be conditioned accordingly; provided, that whenever any heir, distributee, legatee or devisee named in the will

shall make it appear to the court that any executor who has
given bond only as is last mentioned, is wasting the assets of
the estate in his hands or that the said assets are in danger
of being lost, wasted or misappropriated, then, in that case,
the court shall°require the said executor to increase the pen-
alty of his bond to such an amount as the court shall think
proper." The register of wills is by section 267, article 93,
*ibid.,* required to keep a docket showing the grant of letters
testamentary or of administration and a "short entry of
every paper or proceeding filed in the orphans',court," and
every order of court or register of wills with the proper ref-
erence to the place of recording the same in the same man-
ner as the dockets are kept in the offices of equity courts of
this State.

By section 41, before letters testamentary can be granted
to an executor he must execute an executor's bond in such
penalty as the court or the register may require, with sure-
ties to be approved by one or the other of them. The or-
phans' court nor the register had any authority to commit
letters testamentary to the executor until an executor's bond
in a penalty fixed by one or the other of them with sureties
approved by one or the other of them had been filed. Let-
ters testamentary were actually issued and a bond was actu-
ally filed in this case, and we will, in the absence of any
showing to the contrary, assume that the penalty of the bond
was fixed by the court or the register of wills and approved
by one of them. It is true that the docket shows no entry
of any such approval or any order fixing the penalty of such
bond, and that under section 267, *ibid.,* there should have
been a record of such proceedings. But the evidence shows
that the practice at that time in that office as to recording
the proceedings of the court was careless and unreliable,
and is wholly insufficient to justify us in holding that, be-
cause the docket failed to show that the court fixed the pen-
alty of the bond and approved it, that the penalty was not
fixed or the bond approved.

The appellee, however, says that the bond was invalid be-

cause under section 41, article 93 C. P. G. L., the only proper bond, in cases where the executor is by the will excused from giving bond, is a bond to secure the payment of debts, taxes, etc., and so conditioned, and that as this is not that kind of a bond it is invalid. That proposition is in our opinion unsound. That section does indeed provide that "whenever" an executor is excused by the testator from giving bond, "only such bond shall be given" as may be deemed sufficient to secure the payment of debts, etc., and that such bond shall be conditioned accordingly, but manifestly that provision was not intended to prevent the executor, if he saw fit, from giving the general bond provided for in the preceding part of the section. The statute was meant to confer upon the executor in such a case the privilege of giving a special limited bond, and was evidently for his benefit and personal to him, and (3rd *Woerner, Am. Law of Admn.,* par. 250) one which he could waive. Its obvious purpose was to empower the court to require a bond to protect creditors in cases where the testator excused the executor from giving bond, and where at common law he could not have been required to give any at all.

If the executor, notwithstanding that he is excused by the will, desires to give a general bond, there is no reason why he should not be allowed to do so, and in our opinion the provision referred to does not have that effect.

If the conditions were such as to warrant the belief that the court on application would require him to give a bond to protect the estate, the executor might well desire to dispense with such a proceeding and give such a bond in the first place, and the statute certainly could not have intended to prevent him from doing that. In this case the executor had the privilege of electing whether he would give a general bond or a limited bond, and he elected, as we think he had the right to do, to give the general bond provided for in the statute, which is in our opinion a valid bond.

The next proposition is "that the obligation of the appellees, if any, upon said bond was, under the facts stated in

the record, discharged by operation of law with the lapse
of the period of time allowed by law to the executor for the
settlement of his estate.  * * *  That the obligation, if any,
of the appellees was, under the facts in this case, satisfied
by the filing of the executor's account."  It is based upon
the fact that Talbott was not only an executor, but was also
appointed a co-trustee with Mrs. Poole, and it assumes that
when he passed his account as executor the trust property
became vested in him and Mrs. Poole as trustees.  That
assumption is wholly arbitrary, a pure fiction, and is con-
trary to all the evidence in the case.  Talbott continued for
years after he had passed the account to act as executor and
not as trustee, and Mrs. Poole at no time had possession or
exercised any control over the estate, nor can we assume
as a matter of law that she acquiesced in Talbott's exclusive
control of it.  Unless commanded by some positive and per-
emptory rule of law, we would not under such circumstances
be justified in holding that, upon the statement of the final
administration account by Talbott and the expiration of
the period allowed by law for administration of the estate,
that it became vested in Talbott and Mrs. Poole as trustees,
especially in view of the repeated demands made upon Tal-
bott to transfer it to the trustees.  In cases where the same
person is executor and trustee, the court will, for the reasons
stated in *Wooley v. Price,* 86 Md. 178, 179, presume that
after the time for settling the estate in the probate court has
passed he holds the property as trustee.  *State, use of Gable
v. Cheston,* 51 Md. 382.  And in *Wooley v. Price, supra,*
it was held that where, of two executors, one was given one-
half the estate in trust while the other was given one-half
absolutely, that after the time fixed by law for the adminis-
tration of the estate, the executors held the property as lega-
tees because: "There was no visible change of possession;
but there was a change in the nature of the title by which
they held.  The trusts of the executorship *eo instanti* ceased.
They held thereafter the whole of the residue as tenants in
common, and not jointly as executors.  Their visible pos-

session was the same, but they held in a different character. After this change in the character in which they held, of course they could divide the residue, and each one would hold one-half in severalty; the widow for her own use, and Palmer in trust. The fact that as executors they held jointly, and afterwards they held as tenants in common, suggests a technicality of too refined and subtle a nature to be accepted as the basis of a legal doctrine, which is to determine valuable rights, and to settle serious responsibilities. If they had executed a deed conveying the residue from themselves as executors to themselves as tenants in common it would certainly have terminated their responsibility as executors. And yet this would have been an idle formality, which would accomplish nothing more than would take place by implication of law without any act on their part." But that reasoning has no application here, because Mrs. Poole never at any time had any control of the estate either as trustee or executor, nor could she have acquired such possession or control without some affirmative act by the executor.

The general rule followed in *State v. Cheston,* 51 Md. 352, is thus stated in 24 *C. J.,* 1066: "Where the representative also occupies some other character with regard to the estate, such as guardian or trustee, it will be presumed that the property in his hands is held in that capacity in which he ought to hold it." And in speaking of that rule, it is said in *Woerner on Am. Law of Admn.* (3rd ed.), par. 255: "But the efficacy of bonds cannot be permitted to be endangered or destroyed by applying this doctrine to the transfer of the mere indebtedness of a fiduciary from himself in one, to himself in another capacity, so as to exonerate his sureties in the former capacity, and either throw the burden on another set of sureties, or entail the loss on the beneficiaries, without some overt act manifesting the transfer of actually existing assets." While this Court has declined to accept the reasoning of this author, it has never gone to the extent of holding that property in the exclusive possession of an

executor, which he refused or on demand failed to surrender to testamentary trustees, of whom he is one, must nevertheless be presumed to have been in the possession of such trustees because it ought to have been in their possession. To effect a transfer under the circumstances of this case there must have been some affirmative overt act by the executor. 40 *L. R. A.,* N. S., 1136.

In regard to the fourth proposition, it is sufficient to say that the record fails to show any conduct of the trustee, Georgia Poole, which can be said as a matter of law to bar the appellants' right to recover in this case.

For these reasons the first prayer of the defendants should have been refused, and it therefore becomes necessary to reverse the judgment appealed from.

*Judgment reversed, and case remanded for a new trial.*